Filed 6/17/24  In re Y.E. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re Y.E., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E083043 |
| Plaintiff and Respondent, | (Super.Ct.No. J289233) |
| v. | OPINION |
| A.H., et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Affirmed.

Terence M. Chucas, under appointment by the Court of Appeal, for Defendant and Appellant, A.H.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant, O.E.

1

Tom Bunton, County Counsel, and Joseph R. Barrell, Deputy County Counsel, for Plaintiff and Respondent.

Appellants A.H. (mother) and O.E. (father) appeal the juvenile court's order terminating parental rights and freeing their child Y.E. (born in 2017) for adoption. (Welf. & Inst. Code, § 366.26.)[1]  They contend the San Bernardino County Children and Family Services (CFS) and the court failed to comply with the inquiry requirements set forth in the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) and Welfare & Institutions Code section 224.2, and the court erred by failing to apply the beneficial parent-child relationship exception to adoption.  (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).)  We disagree and affirm.

## I.  PROCEDURAL BACKGROUND AND FACTS

*A.    Detention.*

On January 14, 2021, Riverside County Department of Public Social Services (the department) received an immediate response referral after mother was arrested for reckless driving and child endangerment.  The social worker interviewed mother and she provided contact information for the maternal grandmother who was unable to care for Y.E. but recommended the maternal aunt (Ag.H.).  Mother identified father as the child's biological father and claimed that he had kidnapped Y.E. in 2019.  She had domestic violence restraining orders against father; one in Contra Costa County that was set to expire on May 31, 2022, and the other in Alameda County that was set to expire on

---

[1]  All undesignated section references are to the Welfare and Institutions Code.

September 23, 2023.  Father's whereabouts were unknown, and the paternal grandmother could not be reached.  Regarding ICWA, mother reported having possible Indian ancestry (through Y.E.'s maternal great grandmother) but was not a registered member.  The maternal grandmother denied Native American ancestry.

On January 20, 2019, dependency proceedings were initiated pursuant to section 300, subdivisions (b)(1) (mother's unresolved substance abuse/mental health issues, father's kidnapping the child, and the parents' history of domestic violence) and (g) (mother's incarceration and father's absence).  The juvenile court detained Y.E., ordered supervised visitation, and found ICWA may apply.

*B.    Jurisdiction/Disposition Report and Contested Hearing.*

In its jurisdiction/disposition report filed February 5, 2021, and addendums filed March 11, April 6, and May 10, 2021, the department recommended Y.E. be declared a dependent of the court and remain in out-of-home custody, reunification services and supervised visitation be offered to both parents, mother complete a psychological evaluation, and the case be transferred to San Bernardino County where mother was living.  Mother has a history of unaddressed mental health issues; she appears to have paranoia, continues to engage in domestic violence with her partners, and has been hospitalized on a psychiatric hold.  Due to her mental health issues, Y.E. was malnourished, was not current on his immunizations, was not being treated for Thalassemia, had poor socialization skills, and had a severe speech delay.  Mother ignored the social worker's concerns, denied the events that led to Y.E.'s detention, had no concerns for his safety, and demanded he be returned to her care.

The social worker spoke to father on March 8, 2021; he was living in Berkeley. He agreed that mother has severe mental health problems and accused her of taking the child away from him. He denied kidnapping Y.E., claiming he did not know that mother had changed the custody order. The social worker met with father, and the paternal aunt (Y.S.) and her spouse (J.R.), on March 22, 2021. Y.S. stated that she and father share the same father, and that the paternal grandfather and stepgrandmother are foster parents who would like to have Y.E. placed with them. A background check revealed father's criminal history, including domestic violence with partners.

Regarding ICWA, on February 2, 2021, mother reported having Chickasaw ancestry through the maternal grandmother (F.B.H.) and Choctaw ancestry through the paternal great grandfather (L.D.C.); however, she denied any family member being a registered member of either tribe, or having further affiliation. On February 3, 2021, the department initiated an ICWA search of mother's family members. On March 8, 2021, father indicated he has an aunt of tribal ancestry, but he had no further information. However, on April 9, he filed a Judicial Council Forms, form ICWA-020 parental notification of Indian status (ICWA-020), which denied any Indian ancestry. That same day, and in father's presence, his counsel told the juvenile court, "I did provide . . . an ICWA form. There is no ICWA." The department filed the responses of the Choctaw Nation of Oklahoma, the Mississippi Band of Choctaw Indians, and the BIA to its ICWA inquiry. None of the individuals identified by mother were enrolled, or eligible for enrollment, in either Choctaw tribe.

4

The juvenile court sustained the allegations (except g1 and g2) in the amended petition, declared the child to be a dependent of the court, removed him from mother's custody, and found that ICWA may apply. The court ordered reunification services and supervised visitation. The matter was transferred to San Bernardino County.

C.    *Six-month Status Review Report and Contested Hearing.*

According to the six-month status report filed November 15, 2021, CFS continued to recommend Y.E.'s out of home placement, reunification services for the parents, and supervised visitation. It was noted that ICWA may apply. Mother's family members include her aunt (J.G.), cousin (L.W.), grandmother (C.C.), and father (L.C.), all living in the same home. Mother was living in a one bedroom apartment, had completed parenting, individual therapy, and outpatient substance abuse classes, tested negative for substances, was scheduled for a psychological evaluation, and regularly visited Y.E. In contrast, father was not participating in services, his visitation was sporadic (he lived in Northern California), and he did not communicate with the social worker. CFS continued to assess family members for placement. The juvenile court continued reunification services and supervised visitation for both parents. On December 22, 2021, mother was granted unsupervised visitation, and the court authorized holiday visits as appropriate.

D.    *Twelve-month Status Review Reports and Contested Hearing.*

In its 12-month status review reports filed February 16, 2022, CFS asked that Y.E. be returned to mother's custody on a 29-day extended visit, and father's services be terminated. CFS continued to make ICWA inquiries. The child remained bonded with mother, who was "attentive and nurturing" during visits. Mother "actively participated

5

and completed her case plan objectives, including Outpatient Treatment Program, Individual Counseling, Domestic Violence Program, and a Psychological Evaluation. [She had] demonstrated sobriety with consistent Negative drug testing results. [She had] shown benefit of these services, specifically applying new protective capacity skills in order to provide a safe living environment for [Y.E.]." On March 28, 2022, the juvenile court returned the child to mother's custody, and over father's objection, terminated his services and visitation.

E. *Supplemental Petition, Reports, and Hearing.*

Three months later, a section 387 supplemental petition was filed based on mother's June 26, 2022 arrest and substance abuse, which impacted her ability to care for Y.E. Mother was homeless; she was observed hitting her boyfriend with an iron rod, both were "extremely intoxicated," and she threw Y.E. over a five-foot fence. Y.E. was detained.

The jurisdiction/disposition report filed July 20, 2022, recommended no reunification services for mother (due to the statutory time frame of the case) or father (they were previously terminated), and Y.E. remain in foster care with adoption as the permanent plan. CFS and the juvenile court continued to make ICWA inquiries, including obtaining information from the maternal great aunt (J.C.G.). According to the social worker, mother had not benefitted from reunification services because the "current removal of the minor child . . . occurred due to the mother repeating a similar pattern of behavior and engaging in domestic violence in the [child's] presence." In addition to her June 26 arrest, mother was arrested on May 21, 2022, for driving under the influence

6

after causing an accident with injuries; Y.E. was present and "reportedly sustained an injury." As for father, his whereabouts remained unknown and he had not provided any support or protection for Y.E.

On September 7, 2022, the parties agreed to amend the petition to allege mother had a history of alcohol abuse and that she was arrested and unable to arrange for Y.E.'s care; all other allegations were dismissed. Y.E. was removed from mother's custody, mother's reunification services were terminated, and visits reverted to being supervised. CFS recommended placement in the concurrent planning home of a maternal cousin (L.W.). A permanent plan review (PPR) hearing was set.

F.    *Permanent Plan Review Period.*

In its section 366.3 post-PPR report filed March 2, 2023, CFS recommended termination of parental rights and a permanent plan of adoption. On February 14, 2023, L.W.'s home was approved for placement of Y.E. who had been living with her since July 14, 2022. The child had adjusted well to living with her, was bonded to her, and she was willing to provide a stable, loving home for him. CFS noted that ICWA may apply and had sent informal notices to all tribes and the BIA. On March 7, 2023, the juvenile court adopted the findings and orders listed in the PPR report, found visitation with father to be detrimental, maintained supervised visitation for mother, found the permanent plan of adoption appropriate, and set a section 366.26 hearing.

According to an additional information to the court report (6.7 report) filed May 2, 2023, the social worker spoke to two maternal cousins (C.W. and S.G.) about Native American ancestry. Mother reported that J.C.G. (C.W.'s aunt and S.G.'s mother) would

7

be the family member who would have more information. Prior conversations with J.C.G. regarding Native American ancestry were furnished to the court. No family member was able to provide contact information for other family members who may have information regarding the child's Native American ancestry.

G.    *Section 388 Petitions.*

On June 1, 2023, mother filed a section 388 petition. She requested vacatur of the section 366.26 hearing and either returning the child to her custody under family maintenance, or reinstating services under the child's permanent plan with liberalized and increased visitation. The changed circumstances involved her focusing on "maintaining [her] sobriety and establishing stability in [her] life," and enrolling in the "6-month Perinatal Substance Abuse Treatment Program" wherein she has been randomly drug tested with negative results. She had also completed several sessions of anger management, parenting, self-care, and life skills programs, regularly attends AA/NA meetings, was attending Victor Valley College, was employed at Dollar General, had moved into a two bedroom apartment, had maintained consistent visitation, had learned from her mistakes, and was "ready to demonstrate to the Court that circumstances have changed tremendously." She failed to explain how the change was better for Y.E. A hearing on the petition was scheduled.

On June 13, 2023, father filed a section 388 petition regarding the juvenile court's March 28, 2022, order, and requested reunification services and visitation be reinstated. His asserted changed circumstances included actions that occurred prior to March 28, 2022. Nonetheless, he argued his requested changes were in the child's best interest

8

because he is the "biological father, [and] there is a clear bond between [the two] that [he] would like to prove in court." The court summarily denied father's petition.

In response to mother's section 388 petition, CFS noted the child indicated he wanted to live with L.W. and not his mother because she "'takes me to peoples' houses all day. . . . The people be all mean to me. The other kids were being mean to me. They tried to hurt me.'" When CFS began supervising mother's visitation, Y.E. became very uncomfortable when he found out his caregiver would not be with him. According to a 6.7 report filed September 6, 2023, in April, Y.E. had "mild temper tantrums when [his] mother was talked about." At a visit in May, he screamed that he did not want to see mother and said, "my mother is a loser." At the end of a visit in June, he did not voluntarily go to mother to embrace her goodbye; rather, she "had to ask him for hugs." The social worker expressed concern about mother's unresolved mental health issues, her contact with father (despite their past history), and her history of engaging in domestic violence with her partners. CFS recommended denial of mother's petition.

On July 5, 2023, the juvenile court received and accepted into evidence mother's section 388 petition and CFS's response dated June 26, 2023. The child's counsel had spoken to Y.E. who "denied feeling safe with the mother" and indicated he wanted to live with his current caretaker. Mother's counsel renewed a request for an evidentiary hearing. In response, the child's counsel argued that because of Y.E.'s comments there is no reason for an evidentiary hearing. CFS argued "that prima facie has not been met with regards to . . . the second prong required under 388, best interest of the minor." The court agreed and denied an evidentiary hearing on mother's petition.

9

G.    *Section 366.26 Reports and Hearing.*

According to the section 366.26 report filed June 22, 2023, CFS recommended termination of parental rights and implementation of the permanent plan of adoption. Y.E. remained placed in the home of L.W., with whom he had a strong bond and attachment. The child conveyed "that he does not feel safe in the care of his mother and does not want to return to her care."

The section 366.26 hearing was continued several times to allow CFS to complete additional ICWA inquiry. During this time, the social worker obtained contact information for a paternal aunt (Y.S.), a paternal uncle (J.R.), the paternal grandfather, and the paternal stepgrandmother. She called these relatives and left messages inquiring about their Indian ancestry. She also called a maternal uncle (A.A.) and maternal cousin (J.S.) and left messages inquiring about Indian ancestry. Further inquiry continued and notices were sent to several identified tribes; however, no tribe has indicated that Y.E. is an Indian child.

On August 18, 2023, Dr. Elizabeth Stanton completed the bonding study "to determine the type of attachment pattern that exists between" mother and Y.E. She observed one three-hour visit on August 11 and concluded "the interactions between Mother and Child were positive, playful, reciprocal, and appropriate. Considering the beneficial relationship that exists between Mother and Child, severing contact could be detrimental."

In the 6.7 report filed October 8, 2023, the social worker noted that Y.E. was recalling past events with mother, and the memories caused him to feel unsafe with her.

10

He stated that when he has to see mother, he is "fake happy" because he "hates [her]." The social worker opined that "continued visitation is affecting [the child's] mental health which is affecting his ability to participate and benefit from attending school." CFS submitted a Healthy Homes referral to retain a therapist to help him process his trauma, and requested the juvenile court discontinue mother's visitation because it is detrimental to him. The court denied the request on the grounds "the information in the 6.7 [report does not] rise[] to that level. So the visitation order remains in effect. However, if the child refuses visits, the Court will not force him to visit."

On November 27, 2023, mother requested the juvenile court reiterate the visitation order. Her counsel stated, "It's my understanding that since the last hearing, [CFS] has not made an effort to schedule any visitation for [mother]. She has continued to try and reach the social worker and . . . the supervisor's supervisor. She has maintained contact with the receptionist at the CFS office. She does not get return calls. [¶] . . . But my client does want to exercise her right to visitation and believes that [CFS] is impeding that." The court requested CFS implement the visitation order. At a supervised visit on December 29, 2023, Y.E. appeared "very anxious demonstrated by pacing around." He called mother by her first name and appeared to fear that "she'll take him to people's houses."

The section 366.26 hearing was held on January 10, 2024. The juvenile court reviewed CFS's compliance with ICWA. Only mother's counsel objected to any finding that CFS met its duty of inquiry, as well as its duty in regards to *In re Ezequiel G.* (2022)

11

81 Cal.App.5th 984. The court reviewed the six factors[2] enumerated in *Ezequiel G.*, and concluded none were present. The court explained, "While there has been information provided to the Court that there may be a reason to believe that the child is an Indian child, this Court has been waiting months for the Catawba Nation to provide updated information and notice was given previously to a number of tribes, including the Chickasaw Nation, as well as the Catawba Nation." The court noted that "extended family members have been interviewed. They had provided information. That information has been provided to [CFS] and they conducted necessary inquiry based on the information and as of today's date, there's still no information provided the child is an Indian child." Thus, the court found ICWA did not apply.

After both sides presented documentary evidence, the juvenile court heard the testimony of one witness, mother. She testified that prior to Y.E.'s removal from her custody (two years ago), she was responsible for his daily care. Since his removal she has consistently visited him except for two months at the beginning of 2023, and from "September 27th up until two Fridays ago." Mother opined that Y.E. cares about her; she described a recent visit wherein he accompanied her to the bathroom because he "didn't

---

[2] "Number one, the Court has been advised that the child is an Indian child; number two, the child or child's residence is on a reservation; number three, any participa[nt] in the proceeding informs the Court that it has discovered information indicating the child is an Indian child; number four, the child gives the Court reason to know he or she is an Indian child; number five, the child is or has been a ward of the tribal court; or number six, either the parent or the child possess an identification card indicating membership or citizenship in the Indian tribe.· If none of the six factors are met, the Court must make a finding that there is no reason to know the child is an Indian child."

12

want to leave [her] alone," and at the end of the visit, he was "happy." She believed termination of parental rights would be detrimental to Y.E. because "[i]t's taking [her] from the privilege of [her] actually being able to raise him as [her] son and actually having his mom in his life, as [she] always [has] been."

Mother's counsel asked the juvenile court to apply the beneficial parent-child relationship exception (§ 366.26, subd. (c)(1)(B)(i)) and select a plan of legal guardianship. (*In re Caden C*. (2021) 11 Cal.5th 614 (*Caden C*.).) Regarding the parent-child bond, she argued that if CFS had not failed to comply with the visitation order, the court "would have been able to further see there is, in fact, that bond." However, she admitted there "was some indication from the social worker that the child did not want to visit." Nonetheless, she noted that Dr. Stanton's bonding study "indicates there's a secured attachment between the child and the mother and . . . that severing contact . . . would be detrimental." Thus, based on the bonding study and mother's testimony, counsel asked that the court find the termination of parental rights is not in the child's best interest. Alternatively, she asked that the order be stayed until the "number of visits that are owed to [mother] take place and/or order visits to occur even with the termination of parental rights." Father's counsel also argued termination of parental rights is not in the best interest of the child because "father wants to be a part of his son's life and will do anything to be a part of his life." He agreed with the request for legal guardianship.

CFS and the child's counsel requested the juvenile court terminate parental rights and free Y.E. for adoption. The child's counsel asked the court to find Y.E. "specifically and generally adoptable." In addition to the bonding study, counsel summarized the

13

more recent and "ample evidence of the lack of parental bond and how a continued relationship is not beneficial to the child." Counsel noted that visits, before and after the August 2023 bonding study, indicate the child was distant from mother, did not voluntarily go to her to embrace her goodbye, expressed his desire to remain with his caregiver, called her a "bad mommy," and was "fake happy" when he saw her. Counsel objected to mother receiving more visits. Assuming mother engaged in regular visitation, CFS argued "there is insufficient evidence to find that any relationship between Mother and [Y.E.] outweighs the benefit of adoption."

In selecting and implementing a permanent plan, the juvenile court found clear and convincing evidence that Y.E. is both generally and specifically adoptable. After noting that reunification services had been previously terminated, the court considered the parental-benefit exception to termination of parental rights. The court agreed that mother satisfied the first element of *Caden C.* (regular visitation). Turning to the second and third elements, the court considered Dr. Stanton's recommendation, Y.E.'s comments and actions during visits with mother, and the factors that shape the parent/child relationship. It observed: (1) Y.E. was removed from mother when he was three years old, returning for an extended visit before being removed again; (2) he experienced "quite a bit of trauma"; (3) he had adjusted well to the caregiver's home, making great strides and enjoying being a child; and (4) he did not feel safe in, nor did he want to return to, mother's care. Based on this information, the court found insufficient evidence of a substantial bond between mother and Y.E. such that termination of parental rights would be detrimental to him. As to father, the court found that he failed to carry his burden of

14

proof "as there was no testimony taken today from [him]." Thus, the court terminated parental rights, ordered adoption as the permanent plan, and declined mother's request for further visits.

## II. DISCUSSION

Father contends CFS did not satisfy its duty to inquire whether Y.E. may be an Indian child and the juvenile court failed to ensure CFS complied with ICWA and related California law. Mother contends the court erred in not applying the parental relationship exception to adoption. Each join in the other's contentions.

### A. ICWA.

To protect Indian children and promote the stability and security of Indian tribes and families, ICWA establishes "minimum federal standards that a state court . . . must follow before removing an Indian child from his or her family." (*In re Austin J.* (2020) 47 Cal.App.5th 870, 881.) Both ICWA and our state law define an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); see Welf. & Inst. Code, § 224.1, subds. (a), (b) [incorporating federal definitions].) "Under California law, the juvenile court and county child welfare department have 'an affirmative and continuing duty to inquire' whether a child subject to a section 300 petition may be an Indian child. [Citations.] 'This continuing duty can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice.' [Citation.]" (*In re Samantha F.* (2024) 99 Cal.App.5th 1062, 1066.)

15

The duty to inquire whether a child is an Indian child begins with "the initial contact," i.e., when the referring party reports child abuse or neglect that triggers CFS's investigation. (Welf. & Inst. Code, § 224.2, subd. (a).) CFS's initial duty to inquire includes asking the child, parents, legal guardian, extended family members,[3] and others who have an interest in the child whether the child is, or may be, an Indian child. (*Id.*, subd. (b).) Similarly, the juvenile court must inquire at each parent's first appearance whether he or she "knows or has reason to know that the child is an Indian child," (*Id.*, subd. (c)) and require each parent to complete an ICWA-020 parental notification of Indian status form. (Cal. Rules of Court, rule 5.481(a)(2)(C).) The parties are instructed to inform the court "if they subsequently receive information that provides reason to know the child is an Indian child." (25 C.F.R. § 23.107(a); see Welf. & Inst. Code, § 224.2, subd. (c).)

"We review claims of inadequate inquiry into a child's Indian ancestry for substantial evidence. [Citation.]" (*In re H.V.* (2022) 75 Cal.App.5th 433, 438.) Under that standard, "'[w]e review the evidence in the light most favorable to the dependency court's findings and draw all reasonable inferences in support of those findings. [Citations.] Thus, we do not consider whether there is evidence from which the dependency court could have drawn a different conclusion but whether there is

---

[3] ICWA defines "'extended family member'" by "the law or custom of the Indian child's tribe" or, absent such law or custom, as "a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); see Welf. & Inst. Code, § 224.1, subd. (c) ["'extended family member' . . . defined as provided in Section 1903" of ICWA].)

16

substantial evidence to support the conclusion that the court did draw.'" (*In re J.N.* (2021) 62 Cal.App.5th 767, 774.)

Here, the dependency was initiated in Riverside County in January 2021, and father first contacted the department (not CFS) on March 5. The social worker spoke to father on March 8, and he stated that he was born in San Diego and raised by his grandmother and his aunt, but lived on and off with his parents. He indicated "an aunt of his has tribal ancestry, but he does not have any further information." On March 22, 2021, the social worker met with father, his sister (Y.S.) and her spouse (J.R.) at the department. The four discussed the allegations in the petition, placement of the child with Y.S. (who was on probation) and J.R. (who has a criminal history). Y.S. stated that she and father share the same father (paternal grandfather) and the paternal grandfather and stepgrandmother are foster parents who were also interested in placement of the child. Although father's family members were not asked about Indian ancestry, the department had previously noted that ICWA may apply through mother's side.

Father attended the hearing on April 9, 2021, and was represented by counsel. Father's counsel stated, "The paternal aunt is outside. I did get a hold of her information and I have presented it to the department. She would like to be also looked at with regards to placement of the child. [¶] Father already is in an online parenting class. . . . [¶] And, also, he does need a referral for counseling. I don't see a case plan in here, but I am pretty much sure that's what they're going to be asking for. But we do need a case plan for father. . . . [¶] *I did provide . . . an ICWA form. There is no ICWA.* And a JV-140, indicating a P.O. Box. [¶] That information as to where the aunt lives, I am asking

that to be held confidential." There was further discussion regarding father's visitation and authorization for the paternal aunt to also visit with the child. The juvenile court stated, "I do have . . . father's ICWA-020, where he is not aware of any American Indian ancestry, and the JV-140. Both will be filed with the court today." Father's ICWA-020 form, which denied any Indian ancestry, was filed that same day.

At the contested jurisdiction hearing on May 13, 2021, both father and his counsel were present. Father's counsel objected to the proposed amended petition because it incorrectly stated the duration of mother's restraining order. Counsel further advised the juvenile court that father's middle name is not Camino. When the court found that "the Department conducted a sufficient inquiry regarding whether the child may have Indian ancestry," neither father nor his counsel objected. The court set the six-month review hearing and informed both parents that the case will be transferred to San Bernardino County.

On May 18, 2021, at the transfer hearing, both father and his counsel were present. Mother's counsel stated the family law restraining order is the only active one. Father's counsel requested that this information be part of the record that does go to San Bernardino. The juvenile court ordered the matter transferred out of Riverside County and directed father to "appear next in San Bernardino court." When the San Bernardino County court accepted transfer of the case, it adopted "the findings and orders made in Riverside County."

Subsequently, a social worker called father on November 5 and 9, 2021, February 8 and July 18, 2022, and March 1 and July 6, 2023, to ask about his Indian ancestry; he

did not answer, and she left messages. Father also failed to respond to several calls regarding his services. After failing to communicate with CFS, father first appeared in court on June 26, 2023, for the hearing on mother's 388 petition and to confirm the section 366.26 hearing. At that hearing, he was asked to update his address. Father next appeared on November 27, 2023, for a further contested section 366.26 hearing. At that hearing, the court stated, "We did have a brief conference off the record. There still is an outstanding issue with the Indian Child Welfare Act." Although the court referenced mother providing new information, it did not state whether ICWA was also discussed with father. Father asked, "Can someone explain to me what's going on?" The court replied, "[T]he matter has to be continued for the Court to finalize any issues with the Indian Child Welfare Act, so I'm going to set another contested hearing." Father said, "Okay." Father next appeared on January 10, 2024. Nothing in the reporter's transcripts shows that he was asked about his Indian ancestry. Rather, the court discussed mother's Indian ancestry and, ultimately, concluded ICWA did not apply.

Father complains the department (Riverside County) failed to ask him, his sister, or his father about the child's Indian ancestry. He further faults CFS and the juvenile court (San Bernardino County) for not asking him about "family contact information or Indian ancestry."

In Riverside County, after April 9, 2021, father's sister failed to involve herself in the case or respond to the department's attempts to contact her. As for other family members, father never provided the department with contact information for the paternal grandparents or the grandmother or aunt that he had lived with, and none appeared at the

19

detention or jurisdiction/disposition hearings. Moreover, father's ICWA-020 form and his counsel specifically informed the court that ICWA did not apply. Given these specific facts, we find insufficient information to suggest the department or Riverside County court conducted an inadequate inquiry into the child's Indian ancestry.

After the case was transferred to San Bernardino County, the juvenile court adopted the prior findings and orders from Riverside County. One of those findings was that ICWA did not apply as to father. From November 2021 to June 26, 2023, father made no appearances at court. Simultaneously, he had minimal contact with CFS,[4] was not participating in reunification services, and sporadically visited Y.E. Nonetheless, the social worker repeatedly called father to inquire about his Indian ancestry and obtain contact information for his sister, her spouse, his father and stepmother; however, he did not answer, nor return, her calls. During each hearing when Indian ancestry was discussed, neither father nor his counsel changed or corrected the representations from April 9, 2021, nor did either offer any new information regarding ICWA status. CFS is simply required to make "a good faith effort to gather information about [a child's] membership status or eligibility" (*In re D.F.* (2020) 55 Cal.App.5th 558, 570), which the record reflects CFS has done in this case. Again, given these specific facts, we find insufficient information to suggest there was an inadequate inquiry into the child's Indian ancestry. Under the deferential standard of review, we do not disturb the juvenile court's finding that ICWA does not apply on this record.

---

**4** In July 2022 and May 2023, CFS filed separate Declarations of Due Diligence to demonstrate its attempts to notify father of the dependency proceeding.

20

Notwithstanding the above, even were we to find deficiencies in CFS's inquiry or the juvenile court's findings, we conclude any such error was harmless. ICWA inquiry errors are subject to harmless error review. (*In re Benjamin M*. (2021) 70 Cal.App.5th 735, 745 (*Benjamin M*.).) Under *Benjamin M*., "a court must reverse where the record demonstrates that the agency has not only failed in its duty of initial inquiry, but where the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child." (*Id.* at p. 744.)

Here, at the inception of the dependency, father stated he was raised by his grandmother and aunt, occasionally living with his parents; however, nothing in the records indicates that information from any of these relatives was "readily obtainable." Also, father and his counsel specifically informed the Riverside County Juvenile Court that ICWA did not apply, causing the court to make the same finding. After the case was transferred to San Bernardino County, CFS was presented with the Riverside County court's finding. Even so, the social worker called father to obtain further information; he failed to return her calls or provide any information regarding ICWA.[5] She also attempted to obtain contact information for father's father, stepmother, and sister and her spouse, but her call was not returned. Father's disregard for the dependency case

---

**5** Nothing in the record suggests that father lacks knowledge of his family history, as there is no evidence showing he was adopted. (Cf. *In re Dezi C*. (2022) 79 Cal.App.5th 769, 779 [failure to inquire of extended family members may not be harmless if the record indicates that one or both of the parents were adopted and hence their self-reporting of no ancestry may not be fully informed]; see also *In re Ezequiel G.*, *supra*, 81 Cal.App.5th at p. 1015 [in many cases, a child's parents will be a reliable source for determining whether the child or parent may be a tribal member].)

21

complicated[6] CFS's efforts to contact paternal family members regarding the child's Indian ancestry. Again, nothing in the records indicates that information from any of these relatives was "readily obtainable."

In short, we conclude information from the paternal family members was not "readily obtainable." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.) CFS is "'not required to "cast about" for information or pursue unproductive investigative leads.'" (*In re D.F.*, *supra*, 55 Cal.App.5th at p. 570.) Thus, any error alleged by father was harmless under the standard articulated in *Benjamin M.*

### B. Parental Relationship Exception.

Mother contends the juvenile court erred in terminating parental rights because the beneficial parent-child relationship exception applies. Adopting mother's argument, father contends that reversal of the order terminating her parental rights mandates reversal of the order terminating his.

At a permanency planning hearing, once the juvenile court finds by clear and convincing evidence that a child is likely to be adopted, "the court shall terminate parental rights and order the child placed for adoption" unless it "finds a compelling reason for determining that termination would be detrimental to the child due to one or more" enumerated exceptions. (§ 366.26, subd. (c)(1) & (c)(1)(B); see *Caden C.*, *supra*, 11 Cal.5th at pp. 630-631.) "The statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which

---

[6] Arguably, father made CFS's ICWA inquiry efforts impossible by repeatedly refusing to interact with the social worker.

remains adoption." (*In re Celine R*. (2003) 31 Cal.4th 45, 53.) One exception is the beneficial parent-child relationship exception. (§ 366.26, subd. (c)(1)(B)(i).) In *Caden C.*, our Supreme Court examined this exception and held that a drug-addicted parent's failure to succeed in drug rehabilitation programs and continuing struggles with addiction did not, on its own, disqualify the parent from being accorded the beneficial parent-child relationship exception. (*Caden C.*, *supra*, 11 Cal.5th at pp. 637-641.) In other words, unless the factors that led to the dependency in the first place also bear on the question of whether a child would benefit from continuing the relationship and be harmed, on balance, by losing it, they are irrelevant. (*Id*. at p. 638.)

Under the parental relationship exception, the parent must show, by a preponderance of the evidence, each of the following three elements. First, he or she had "regular visitation and contact with the child, taking into account the extent of visitation permitted." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) Second, "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Ibid*.) This element is affected by "'[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Id*. at p. 632.) In conducting this assessment, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Ibid*.) Third party witnesses, including psychologists, can provide relevant evidence about the parent/child bond. (*Id*. at pp. 632-633.) Third, "terminating that [parental] attachment would be detrimental to the child even when balanced against the countervailing benefit

of a new, adoptive home." (*Id*. at p. 636.) "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350, disapproved on another ground in *Caden C.*, at p. 636, fn. 5.)

We employ a "hybrid standard" of review to the juvenile court's findings on the application of the beneficial parent-child relationship exception. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-641.) The first two elements are primarily factual and reviewed for substantial evidence. (*Id*. at pp. 639-640.) On the third element, the "court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home." (*Id*. at p. 640.) Thus, any factual determinations underlying the court's evaluation would also be reviewed for substantial evidence, but the court's ultimate balancing of the detriment of severing the parent-child relationship against the benefits of adoption is reviewed for abuse of discretion. (*Id*. at pp. 640-641.)

In the present case, the juvenile court agreed that mother regularly visited the child. However, in a detailed analysis of the facts, the court concluded mother failed to demonstrate that her visits with Y.E. created an emotional attachment of such substantial nature that losing it would cause a net detriment when compared with the benefits of adoption. (See *Caden C.*, *supra*, 11 Cal.5th at p. 634.) The record supports the court's conclusion. In *Caden C.*, the child "grew distressed at the prospect of not living with his mother," and witnesses testified that he would suffer detrimental effects if his contact with mother was terminated. (*Id*. at p. 627.) Here, in contrast, Y.E. displayed no

24

negative emotions when separating from mother after visitation. He did not want to see her, he did not trust her, and he feared that she would take him to other people's houses. Y.E. referred to mother by her first name, was anxious at visitation, and said he was "fake happy" when any positive interactions with her were observed. Y.E. did not want to return to mother's care; rather, he wanted to live with his caregiver.

Nonetheless, mother asserts it was a "mistake for the juvenile court to ratify the social worker's extrapolation that [Y.E.'s] anger at his mother was a solid foundation for concluding that he did not have a beneficial relationship with [her]." She argues the child's anger, along with his claims that he did not want to return to live with her, "were not relevant to the applicability of the beneficial relationship exception because return of a child to a parent's custody is not an issue at a section 366.26 hearing." She contends "the fundamental cause of [the child's] anger . . . was that he was separated from his mother who he loved; and [he] was powerless to do anything to fix the problem."[7] Such contention is nothing more than mere speculation. There is no evidence the child suffered any negative impact away from mother. He did not demonstrate emotional instability. He did not act out, suffer insomnia, anxiety, depression, or any other health condition associated with separation. Instead, when away from mother, Y.E. was

---

[7] In her reply brief, mother cites the first volume of John Bowlby's *Attachment and Loss* series and argues Y.E.'s primary emotional attachment is to her. She faults the record for being silent on the strength of this initial attachment. However, in determining whether the parental relationship exception applies, the primal emotional attachment is only one factor that is considered. (*Caden C.*, *supra*, 11 Cal.5th at pp. 632-636, 636.)

described as being "much friendlier and playful," happy, comfortable, and well-adjusted in his caregiver's home.

Considering the evidence presented, mother failed to carry her burden of establishing every element of the beneficial parent-child relationship exception. Thus, we cannot say the juvenile court abused its discretion in concluding that the benefit of adoption outweighed the child's loss of any positive emotional attachment to his mother. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

## III.  DISPOSITION

The juvenile court's order terminating parental rights is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


McKINSTER
Acting P. J.


We concur:


CODRINGTON
J.


RAPHAEL
J.